# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

---

## CASE NO.  <u>20-195</u>

### H.R., by next friend K. R. and J.R.,
*Plaintiff,*

*v.*

### KILLEEN INDEPENDENT SCHOOL DISTRICT
*Defendant*

---

## PLAINTIFF'S ORIGINAL COMPLAINT

---

**YVONNILDA MUÑIZ**

**LAW OFFICE OF YVONNILDA MUÑIZ, P.C.**
P.O. BOX 92018
Austin, Texas  78709
(512) 288-4279 (Tel.)
(888) 398-8808 (Fax)
ygmuniz@outlook.com [Email]

OLIVIA RUIZ

**LAW OFFICE OF OLIVIA RUIZ, P.C.**
P.O. BOX 50142
Austin, Texas 78763
(512) 233-2622 (Tel.)
(512) 233-2622 (Fax)
obruiz@austin.rr.com [Email]

***Attorneys for Plaintiff***

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………...iii- v

PARTIES………………………………………………………………………....1

STATEMENT OF JURISDICTION AND VENUE……………………………….2

CONDITIONS PRECEDENT……………………………..…………………......3

NATURE OF THE ACTION AND RELIEF SOUGHT…......................................3

STATEMENT OF FACTS.…………......................................................................5

DISCUSSION…………………………………………………………………….16

STANDARD OF REVIEW……………………………………………………….16

ARGUMENTS AND AUTHORITIES……………………………………….…...17

Issue: Whether the Hearing Officer erred in finding that KISD offered H.R. a
        FAPE…………………………………………………………………………18

Issue: Whether the Hearing Officer erred in finding that H.R.'s IEP was
        individualized based on assessments and performance…………………......22

Issue: Did H.R. demonstrate Positive Academic and Nonacademic Benefits?…...32

Issue: Tuition Reimbursement for Private School Placement……….………......33

PRAYER FOR RELIEF........................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*A.A. v. Northside Indep. Sch. Dist.,* 2020 U.S. App. LEXIS 7229
(5th Cir. 2020)…………………………………………………………………..16

*Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist., 328 F.3d 804, 808
(5th Cir. 2003)……………………………………………………………………*16

*Bakersfield City Sch. Dist.,* 51 IDELR 142 (SEA CA 2008*)…………………………*24

*Bastrop Indep. Sch. Dist.,* 116 LRP 13753 (SEA TX 01/05/16)…………………….29

*Board of Educ. v. Rowley*, 458 U.S.176 (1982)…………………………...16, 20, 28

*Chase v. Mesa County Valley Sch. Dist. No. 51*, 2009 U.S. Dist. LEXIS 84671
(D. Colo. 2009)………………………………………………………………………24

*Cypress-Fairbanks Indep. Sch. Dist. v. Michael F*., 118 F.3d 245
(5th Cir.1997)………………………………………………………………16, 21, 22

*Damarcus S. v. District of Columbia*, 190 F.Supp.3d 35 (D.D.C. 2016)…………28

*Dover-Eyota Indep. Sch. Dist. #533*, 113 LRP 23875 (SEA MN 02/13/13)……....25

*Endrew F. v. Douglas Cnty. Sch. Dist., RE-1,* 137 S.Ct. 988 (2017)
…………………………………………………………….…...17, 20, 21, 27, 28

*Flagstaff Arts and Leadership Acad.,* 113 LRP 27180 (SEA AZ 06/15/13)……....29

*Florence County Sch. Dist. 4 v. Carter*, 510 U.S. 7 (1993)…………………...33, 34

*Friedman v. Vance,* 24 IDELR 654 (D. Md. 1996)……………………………....25

*Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed. 2 686 (1988)……………...19

*In re: Student with a Disability*, 50 IDELR 205 (SEA NY 2012)……………...….25

*Jefferson County Bd. of Educ. v. Lolita S*., 581 Fed. Appx. 760
(11th Cir. 2014, unpublished)…………………………………………………...28

*K.D. by Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248 (3d Cir. 2018)……29

*O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233,* 144 F.3d 692
(10th Cir. 1998)……………………………………………………………..24, 26

Pocatello Sch. Dist. #25, 18 IDELR 83 (SEA ID 1991)…………………..……..24

Portland Pub. Schs., 24 IDELR 1196 (SEA ME 1996)…………………...……25

*Renee J. ex rel. C.J. v. Houston Indep. Sch. Dist.,* 913 F.3d 523 (5th Cir. 2019).. 17

*Richardson Indep. Sch. Dist. v. Michael Z. and Carolyn Z. ex rel. Leah Z.,*
580 F.3d 286 (5th Cir. 2009)………………………………………………………...21

*Sacramento City Unified Sch. Dist. v. R.H.*, 68 IDELR 220 (E.D. Cal. 2016)……29

*School Comm. of Burlington v. Department of Ed. of Mass.,*
471 U.S. 359, 85 L.Ed.2d 385, 105 S.Ct. 1996 (1985)……………………….…33, 34

*Teague Indep. Sch. Dist. v. Todd L.,* 999 F.2d 127, 131 (5th Cir. 1993)………….16

**FEDERAL RULES**

20 U.S.C. §§ 1400, *et seq*…………………………………………..…..…1, 18

20 U.S.C. §1401(9)………………………………………………………...18

20 U.S.C. § 1401(19)…………………………………………………..2

20 U.S.C. § 1401(14)……………………………………………….20, 27

20 U.S.C. § 1401(29)……………………………………………18, 20, 27

20 U.S.C. § 1412(a)(1)(A)……………………………………………18

20 U.S.C. §1414(d)…………………………………..................19, 20

20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV)……………………………….20, 27

20 U.S.C. § 1414(d)(1)(A)(i)(II)……………………………………27

20 U.S.C. § 1414(d)(1)(A)(i)(III)……………………………………28

20 U.S.C. § 1414(d)(3)(A)(i)-(iv)……………………………………20

20 U.S.C. § 1414(d)(4)(A)(ii)(I)…………………………………..33

20 U.S.C. § 1415(i)(2)…………………………………………...3

20 U.S.C. §§ 1415(i)(2) and (3)…….……………………………...2

20 U.S.C. § 1415(i)(2)(B)……………………………………………3

28 U.S.C. § 1331……………………………………………………2

28 U.S.C. § 1367……………………………………………………2

28 U.S.C. § 1391(b)………………………………………………...2

**STATUTES, REGULATIONS AND RULES**

34 C.F.R. § 300.8(c)(1)(i)…..…………………………………………………....18

34 C.F.R. § 300.39(b)(3)……………………………………………………..18

34 C.F.R. §300.148(c)…………………………………………………….…..33

34 C.F.R. § 300.320……………………………………………………………22

34 C.F.R. § 300.320(a)(1)……………………………………………………24

34 C.F.R. § 300.530………………………………………………………....5

**OTHER AUTHORITIES**

71 Fed. Reg. 46,662 (2006)…………………………………………………23

Appendix C to Part 300 of the Federal Regulations………………………24

S. Congressional Record (37416)(1975)……………………..………………17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **H.R., by next friend,** | § | |
| **K.R. and J.R.,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO. _____** |
| | § | |
| **KILLEEN INDEPENDENT** | § | |
| **SCHOOL DISTRICT** | § | |
| **Defendant.** | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

H.R., by next friends K.R. and J.R.  ("Student" or "Parents"), Plaintiff, file this his Original Complaint against the Killeen Independent School District ("KISD" or "Defendant") as follows:

### PARTIES

1.      H.R. was, and at the time this action was file with the Texas Education Agency, a student in KISD.  K.R. and J.R. are H.R.'s parents.  H.R. was the Petitioner in the administrative proceeding below.  The student's and parents' initials are used in compliance with the Court's Privacy Policy and Public Access to Electronic Files adopted on May 18, 2004.

2.      Plaintiff H.R. and his parents and next friends K.R. and J.R. maintain a permanent residence in Killeen, Bell County, Texas.  As a student who resides within the Killeen Independent School District, he was and is entitled to all rights, entitlements and procedural safeguards mandated by applicable law and statutes including, but not limited to, the Individuals with Disabilities Education Improvement Act, 20 U.S.C. §§1400 *et seq.* ("IDEA"), and the

1

pertinent implementing regulations promulgated under the Code of Federal Regulations, as well as the pertinent provisions of the Texas State education law and implementing regulations, rules and standards.

3.      Defendant Killeen ISD is a public school district in the State of Texas.  The KISD was the Respondent in the administrative proceeding below.  At all times relevant to this action, the KISD was responsible for the provision of Section 504 services to H.R. and the protections of the Individuals with Disabilities Education Act (IDEA).

4.      KISD is a public entity organized and existing under the laws of the State of Texas and is a local educational agency within the meaning of 20 U.S.C. § 1401(19) with the capacity to be sued.  As a "local educational agency," 20 U.S. C. § 1401(19), the KISD receives federal funds from the United States Department of Education and was statutorily obligated under the IDEA, as well as the laws of the State of Texas, to provide H.R. with the protections of a free appropriate public education ("FAPE") under the IDEA.  It may be served with process through its superintendent, Dr. John M. Craft, at 200 N. WS Young Dr., Killeen, Texas 76543.

**<u>JURISDICTION AND VENUE</u>**

5.      This action is brought pursuant to the IDEA, 20 U.S.C. §1415(i)(2) and (3), against Defendant Killeen Independent School District as a party aggrieved by the findings and decision rendered by a hearing officer.  All administrative prerequisites to jurisdiction have been met. This Court has jurisdiction of this matter to hear and determine this action without regard to the amount in controversy pursuant to 20 U.S.C. §§1415(i)(2) and (3) and 28 U.S.C. §1331.  This Court has jurisdiction to hear pendent state claims under the doctrine of supplemental jurisdiction set forth at 28 U.S.C. § 1367.

6.      Venue in this Court is proper under 20 U.S.C § 1391(b) because the KISD is located within Bell County, which is within the jurisdiction of this judicial district, and because all of the

events or omissions that are the subject of this Complaint occurred within the jurisdiction of this judicial district.

## CONDITIONS PRECEDENT

7.      All conditions precedent to jurisdiction have been fulfilled.  Plaintiff was served with a correct copy of the Decision of the Hearing Officer on December 19, 2019.  This Complaint has been filed within ninety (90) days after the date the hearing officer rendered her decision.  20 U.S.C. §1415 (i)(2)(B).  A true and correct copy of the Decision of the Hearing Officer received by the Plaintiff is attached and incorporated by reference as Exhibit A hereinafter "HOD."  Plaintiff has exhausted his administrative remedies and, pursuant to 20 U.S.C § 1415(i)(2), now files this Complaint appealing the Decision of the Hearing Officer.

## NATURE OF THE ACTION AND RELIEF SOUGHT

8.      This is an action that arises under the IDEA appealing the decision of an independent Special Education Hearing Officer (IHO) appointed by the Commissioner of Education of the State of Texas to consider administrative complaints filed against the KISD on behalf of H.R., a child with a disability as defined in the IDEA.  After a two day evidentiary hearing held on December 4-5, 2019, the hearing officer issued a decision on December 19, 2019, finding that the KISD's decision at a Manifestation Determination Review, pursuant to 20 U.S.C. §1415(k)(1)(E), to place H.R. at a disciplinary alternative educational program (DAEP) for 30 days was incorrect and violated the IDEA.  Furthermore, that the KISD offered H.R. an individual educational program (IEP) that provided him with a free appropriate public education (FAPE) under the IDEA.  See HOD p.21.

9.      It is these findings that H.R. appeals.

10.     In his request for a due process hearing, H.R. complained that he was denied a FAPE pursuant to violations of the Individuals with Disabilities Education Act of 2004, as amended,

3

(IDEA) related to KISD's failure to conduct an appropriate manifestation determination review

(MDR).  The allegations H.R. asserted in his due process complaint are identified in the Decision

of the Hearing Officer as follows:

a.   KISD failed to provide H.R. a free, appropriate, public education during the 2018-19 school year when it failed to provide H.R. with an appropriate educational program, individualized to meet his educational needs, including, but not limited to, his academic, social, emotional, and behavioral needs;

b.   KISD failed to conduct proper evaluations, including an appropriate Functional Behavior Assessment ("FBA");

c.   KISD filed to provide H.R. with an appropriate Behavior Intervention Plan ("BIP");

d.   KISD failed to provide school staff proper training in H.R.'s individualized Education ("IEP") and BIP;

e.   KISD violated the Parents' procedural rights from failing to provide H.R.'s Parent with Admission, Review, and Dismissal Committee ("ARDC") documents in her native language of Spanish;

f.   KISD discriminated against H.R. solely by reason of his disability; KISD discriminated against H.R.'s mother and violated her parental rights under IDEA and Section 504 of the Rehabilitation Act of 1973 when she advocated for H.R. and contested the outcome of a Manifestation Determination Review ("MDR") ARD as "predetermined";[1]

g.   KISD filed to conduct a proper MDR; the MDR decision was erroneous; KISD should have concluded H.R.'s conduct was caused by, or had a direct and substantial relationship to, his disability or it was a result of KISD's failure to implement H.R.'s Individualized Education Plan ("IEP");

h.   KISD failed to utilize the proper the proper definition of "serious bodily injury" in making its MDR and disciplinary alternative education placement ("DAEP") decisions;

i.   KISD made an improper decision that H.R.'s conduct met the correct definition of inflicting serious bodily injury on another person and thus failed to meet the criteria for "special circumstances," which authorized the placement in the DAEP;

---

[1] The Hearing Officer dismissed this issue as an issue attendant to non-IDEA statutes.  HOD p. 5 fn 6.

j.   KISD violated 34 C.F.R. § 300.530 when it removed H.R. from his current education placement to the DAEP; and

k.   KISD's change in H.R.'s educational placement violated IDEA.  HOD pg. 5.

11.   As relief, Plaintiff requested the following:

a.   Reversal of the disciplinary placement in the DAEP;

b.   Reimbursement for the cost of private school tuition for the 2018-2019 school year and fall 2019;

c.   Fund the cost of continued private school placement for the 2019-20 school year;

d.    Provide H.R. with compensatory social skills training at KISD's expense using an evidence-based curriculum during summer 2020;

e.   Provide H.R. with compensatory counseling and occupational therapy ("OT") services at KISD's expense;

f.   Fund monetary damages to H.R. to compensate for KISD's alleged intentional, deliberate discrimination as a result of KISD's failure to provide appropriate services to which H.R. was entitled as a person with a disability;[2]

g.   Reimburse H.R.'s reasonable attorneys' fees;[3]

h.   Make a finding H.R. is a "prevailing party" entitled to attorneys' fees and costs;[4] and

i.   Order such other and further relief the Hearing Officer deems just and proper.  HOD pp. 5-6.

## STATEMENT OF FACTS

12.   At the time of the administrative hearing, H.R. was a nine-year old student who at the time of his withdrawal on January 18, 2019 from KISD attending the third grade at Sugar Loaf Elementary School in KISD.  HOD Findings of Fact of the Hearing Officer (hereinafter "FOF")

---

[2] The Hearing Officer dismissed this requested relief finding that monetary damages are not an appropriate form of relief under the IDEA and outside of the jurisdiction of a Hearing Officer. HOD p. 5 fn. 7.

[3] The Hearing Officer dismissed this requested relief because hearing officers do not have jurisdiction over an award of attorneys' fees under IDEA.  HOD p. 6 fn.8.

[4] The Hearing Officer dismissed this requested relief because hearing officer do not have the authority to award attorney's fees.  HOD p. 6 fn. 8.

31.   At all relevant times, H.R. and his parents lived within the jurisdictional boundaries of the KISD.  FOF 3.

13.   H.R. qualified for special education and related services under the primary disability of Autism ("AU") and the secondary disabilities of Emotional Disturbance ("ED") and Other Health Impaired ("OHI"), based upon Attention Deficit-Hyperactivity Disorder ("ADHD"). FOF 2.

14.   When he was four years old, H.R.'s family moved from Puerto Rico to Killeen, Texas. FOF 4.   At the beginning of the 2014-15 school year, H.R. enrolled in KISD at Trimmier Elementary School.  *Id*.   Because he lives in a home in which Spanish is the primary language, he was placed in a Bilingual Pre-Kindergarten classroom.  *Id*.   When attending pre-school, H.R. had difficulty biting, throwing things, and eliminating on himself at pre-school.  *Id*.   He was suspended for kicking his teacher in the leg.  *Id*.

15.   During his pre-kindergarten school year, H.R. frequently had tantrums at home and, at times, displayed aggression towards others as well as animals.  FOF 5.  At school, H.R.'s major problems were difficulty focusing, being too active, difficulty socializing, often cried and talked to himself.  FOF 6.  He had only one friend and his classmates disliked him because they felt he would get them in trouble.  *Id.*  Academically, H.R. was working on grade level and turning in most of his homework but had difficulty listening to stories and participating in classroom discussions.  FOF 7.  He was extremely active, playful but loud with difficulties attending and concentrating during class.  *Id.*  Due to parental and teacher concerns, KISD conducted a Full and Individual Evaluation ("FIE") as well as a Psycho-Educational Evaluation.  FOF 8. Assessment results in KISD reports, dated November 13, 2014 and November 18, 2014, indicated H.R. did not meet the Texas Education Agency ("TEA") guidelines as a student with a Specific Learning Disability ("SLD"), AU, Speech Impairment ("SI"), or Cognitive Disability

("CD"). *Id.*  The KISD referred H.R. for a Section 504 assessment to determine qualifications for accommodations and modifications.  *Id.*

16.     In April 2015, his pediatrician diagnosed H.R. with ADHD, Combined Presentation and Oppositional Defiant Disorder ("ODD") and referred H.R. for a Psychological Evaluation.  FOF 9.  This time, an assessment found H.R. displayed some symptoms of AU but found there was insufficient evidence to support a formal AU diagnosis and recommended future re-evaluation in the AU area.  *Id.*  Because of the ADHD diagnosis, KISD gave his mother an OHI eligibility report form to be completed by his physician which were signed by his physicians on April 28, 2015 and April 30, 2015.  FOF 10.

17.     During the summer of 2015, H.R. was admitted to the Metroplex Behavioral Health Center.  FOF 14.  He was diagnosed with a Psychotic Disorder/Not Otherwise Specified ("NOS"); AU; ODD; and ADHD. *Id.*

18.     At the beginning of the 2015-16 school year, H.R. enrolled in Peebles Elementary School for his kindergarten school year.  FOF 11.  Because H.R. continued to have behavior problems at home and at school, his mother requested another FIE.  FOF 12.  The FIE was completed on September 7, 2015 and, with the OHI reports diagnosing H.R. with severe ADHD, on September 10, 2015, an ARDC determined H.R. met eligibility criteria for special education and related services under TEA and IDEA as a student with an OHI (ADHD).  FOF 13.  H.R.'s ADHD interfered with his ability to participate in the general education process and accommodations for his educational program could best be provided through special education.  FOF 12.  His ADHD affected him in all academic and non-academic areas; his attention to tasks, speed in operation, ability to follow directions, and comprehension of material.  *Id.*  The ARDC developed a behavior plan and, based on his medical records, requested a Psychological Evaluation to determine whether H.R. had an ED.  FOF 13.

19.     On October 26, 2015, KISD completed an FBA based on teacher input and disciplinary reports and identified three targeted behaviors including (1) aggression in the form of hitting adults; (2) noncompliance in the form of following teacher directives in general; and (3) classroom disruption.  FOF 15.  By this time in the school year, H.R. had received six office referrals, had been sent to a re-focus room fourteen times and had served in-school suspension four times.  *Id*.  The FBA included multiple recommendations primarily related to H.R.'s disruptive and aggressive behaviors towards students and adults.  *Id.*

20.     The Psychological Report, dated November 2, 2015, found he exhibited significant emotional, behavioral, and/or attentional problems and revealed social and communication deficits causing his behavior to impede his learning and that of others.  FOF 17.  His teacher reported that he exhibited unprovoked outbursts of aggression, which were uncontrollable; he hit the teacher, other students, and destroyed property.  FOF 15.  His behavior was so out of control that at times the other students had to be removed from the classroom.  *Id*.  He had problems paying attention and focusing in class, although academically it appeared to be able to do the work but often refused.  *Id*.; FOF 17.  Attempts to get H.R. to work could result in aggressive acting out.  *Id*.  H.R. claimed he had monsters in his head that told him to misbehave.  FOF 16.  Based on the Psychological Report, H.R. displayed the following ED characteristics over a long period of time and to a marked degree, adversely affecting educational functioning: (1) a general pervasive mood of unhappiness or depression, and (2) inappropriate types of behavior or feelings under normal circumstances.  FOF 18.  Specifically, H.R. demonstrated symptoms of a thought disorder consistent with his outside diagnosis of Psychotic Disorder/NOS.  *Id*.

21.     Based on this Psychological Report, an ARDC determined H.R. met eligibility criteria for ED and OHI (ADHD).  FOF 14.  His primary disability was changed to ED and OHI became his secondary disability.  FOF 19.

22.     In January 2016, H.R. was transferred to Ira Cross Elementary School and placed in a self-contained Positive Behavior Support ("PBS") classroom.  FOF 20.  Throughout the spring semester, H.R. was routinely restrained for aggressive behaviors toward staff, students and property damage. FOF 20.  He engaged in self-injurious behaviors including scratching himself, hitting his head on a wall, scratching his face, biting himself, and saying he wanted to kill himself.  FOF 20.

23.     At an ARDC meeting held on May 18, 2016, his teacher and other service providers reported H.R. continued to refuse to work; he challenged authority and displayed destructive behaviors on a daily basis.  FOF 22.  He continued to engage in aggressive behaviors including challenging behaviors, emotional outbursts/tantrums, defiance of authority, incomplete assignments, leaves assigned area, physical aggression, disruption inside the classroom, noncompliance and social isolation/withdrawal.  FOF 23.  His BIP was updated and a new AU evaluation was requested.  *Id*.

24.     There was no change in H.R.'s negative and aggressive behavior at the beginning of his first-grade school year.  FOF 24.  He remained in the PBS classroom at Ira Cross Elementary School.  He charged at staff and students; hit, kicked, and grabbed female staff by their genitals, threw materials, damaged property and often urinated on himself.  *Id*.  His parents reported that he was coming home with bruises and scratches and, on one occasion, a bump on the back of his head allegedly caused by staff restraining him.  *Id*.   They were alarmed how often H.R. was restrained.  *Id*.

25.     Because there was a substantial increase in significant behavior problems, an FBA was completed on January 12, 2017.  HOD 25.  His self-injury episodes increased; he urinated in his clothes in the classroom, he threw and flipped chairs, desks, and trashcans; he punched, kicked and spat on staff.  *Id*.  This time, the FBA identified six target behaviors: (1) negotiating; (2)

verbal refusal; (3) self-injury; (4) self-wetting; (5) physical aggression; and (6) property destruction. *Id*.

26.     During the spring of 2017, an outside provider conducted an Independent Educational Evaluation ("IEE") to determine if H.R. met criteria for AU, ED, and OHI eligibilities, determine his present levels of educational performance and to aid in determining services. FOF 26. The IEE indicated that H.R. displayed impairments in verbal and non-verbal communication as well as social interaction, all consistent with AU. *Id*. His emotional and behavioral functioning was also consistent with ED. *Id*.

27.     On May 31, 2017, an ARDC met to review the results and recommendations of the IEE and its own recent evaluations. FOF 27. The ARDC declined to add the AU disability recommended by the independent examiner and continued his primary disability as ED with OHI as his secondary disability. *Id*.

28.     The ARDC agreed to conduct an Occupational Therapy ("OT") evaluation to evaluate his fine motor skills and sensory needs and agreed to conduct an in-home training assessment. FOF 28.

29.     H.R. continued in the PBS classroom at Ira Cross Elementary School during his second grade school year (2017-18). FOF 29. H.R.'s aggressive behaviors continued and included property damage and vandalism, assault (contact or threat), disruption and conduct towards others. *Id*. Towards the end of this school year, he displayed negative behavior when boarding the school bus. FOF 30. He would become aggressive and defiant in response to directives from transportation personnel. *Id*. His behavior would escalate to the point he was removed from the school bus. *Id*.

30.     H.R. transferred to the PBS classroom at Sugar Loaf Elementary School at the beginning of the 2018-19 school year for the third grade. FOF 31. An ARDC met on August 24, 2018 and

concluded no additional evaluations were needed and continued H.R.'s eligibility for special education services as a student with an ED and OHI.  *Id.*

31.     The ARDC reviewed H.R.'s Present Levels of Academic Achievement and Functional Performance ("PLAAFP") and noted several concerns.  FOF 32.  During independent reading practice and reading instruction, H.R. often stopped trying to read or became frustrated when he could not easily recognize rhyming words and work families, he lacked the ability to decode words in text and isolation.  *Id*.  He became easily agitated when having to learn strategies, concepts, or any text he determined to be too difficult.  *Id*.  H.R. refused to submit to any reading assessment that involved reading on his own and would walk away or attempt to destroy the reading material.  *Id.*

32.     The ARDC was concerned with his impulsivity, his becoming visibly upset and getting excited when presented with an academic task or behavioral demand he viewed as too difficult or required too much time to complete.  *Id*.  He left his assigned area, roamed the classroom, climbed under his desk or just stopped working. *Id*.

33.     The ARDC was also concerned about H.R.'s avoidance behaviors.  FOF 34.  He would assess an academic or behavioral task and, if he determined the task was something he did not want to attempt or complete, he would initiate various levels of physical and verbal aggression. *Id*.  Physical aggression often resulted in attempts to harm others, self-harm and/or property destruction.  *Id*.

34.     The ARDC developed his IEP and a Behavior Support and Intervention Plan (BSIP). FOF 31.  The BSIP set out three targeted behaviors: (1) refusing to begin and/or complete academic tasks which occurred several times a day and could last several minutes to mild to moderate intensity; (2) exhibiting oppositional and defiant behavior towards teachers and authority figures including behaviors such as ripping up his writing journal or other papers;

throwing things to the ground; hitting students and staff; attempting to self-harm; destruction of school property; and elopement from the classroom and school grounds; and (3) aggressive and defiant behaviors when attempting to board the school bus that escalated to the point he would be removed from the bus.  FOF 35.

35.    H.R. received four disciplinary referrals during the first six-week reporting period and five during the second.  FOF 38.  He continued to be restrained.  In one particular incident H.R. got physically aggressive with staff by kicking, punching, and spitting; he hit himself several times; tried to pull the electrical socket off the wall and turned over a desk.  FOF 37.     H.R.'s October 24, 2018 IEP Progress Report indicated that H.R. was not making progress on his IEP goals.   JEX 26.001-002.[5]   His classroom teacher testified that since these IEP goals were developed by the Ira Cross staff, she had nothing to do with these goals and was not responsible for them.  (T1.342: 15-25; 343:4-7.)

36.    The KISD completed another FBA on October 31, 2018.  FOF 41.

37.    On November 14, 2018, the ARDC met to conduct its annual ARD meeting.  HOD FOF 42.  Prior to this ARD meeting, a KISD Licensed Specialist in School Psychology ("LSSP") and an Educational Diagnostician accepted the March 12, 2017 IEE as a re-evaluation and AU become H.R.'s primary disability, ED became his secondary disability, and OHI (ADHD) became his tertiary disability.  FOF 42.

38.    At this point, H.R. was refusing to complete assignments, especially those related to reading, not turning in work in math, and slept a large portion of the school day.  FOF 43.  His BIP listed the same target behaviors since May 2017, which appeared to indicate his BIP was inappropriate or was not being implemented.  *Id.*   He refused to read and write, which affected his grades in other subjects such as math, science and social studies.  *Id.*   He destroyed his work

_____

[5] This IEP progress report was not included in the HOD.

when he became frustrated and engaged in self-harming toward himself and others.  Id.  He continued to urinate on himself.  *Id*.  When extremely upset, staff had a difficult, if not impossible, time redirecting him.  *Id*.

39.    The ARDC targeted three behavior of concern.  FOF 47.  The first behavior of concern was disruption, which was defined as behaviors with inordinate levels of physical motion/activity or vocalization within the classroom which interfered with the educational process by producing turbulence and/or discord. FOF 47.  During these episodes, H.R. was ripping up papers, throwing things to the ground, hitting students and staff, self-harm, and elopement.  *Id.* The second behavior of concern was defiance, which was defined as any occurrence of saying "no," "I don't want to," "not now," or "you can't make me" to any academic or non-academic request.  *Id*.  The third behavior of concern was physical/verbal aggression.  *Id*.  Physical/verbal aggression referred to physical/verbal behaviors that were not appropriate for the classroom environment and could pose a threat to the safety of the student, other students, and to staff members.  *Id.*  Within a moment's notice, H.R. could go from working successfully to displaying non-compliant behavior; he became aggressive and verbally combative; he engaged in self-injurious behaviors.  *Id*.  These episodes could last for a moment or much longer.  *Id*.

40.    The ARDC added two English Language Arts/Reading and math goals.  FOF 48.  There were four behavior goals, two addressed self-regulating skills to avoid engaging in an unexpected behavior, refraining from engaging in self-injurious behaviors, and physical aggression.  *Id*.

41.    According to the HOD, H.R.'s December 2018 IEP Progress Report indicated he was making some progress on his goals, but his progress was minimal, and his behavior continued to impede his education because staff was having a difficult time keeping him focused.  HOD FOF

13

50.   A review of his December 2018 IEP Progress Report indicated that he was not progressing on his two ELAR goals, his two functional-physical factors goals[6], nor on any of his four behavioral-emotional factors goals.  JEX45:638-640.  Although it was reported he made "some" progress on his two math goals, his teacher reported H.R. was adding/subtracting 2-3 digit numbers and multiplying 1 digit numbers.  JEX45:638.  However, neither of these goals have PLAAFP indicating at what level H.R. was when the goals were developed.  *Id.*  Further, no data was provided with any measure of how much progress he made toward the mastery level on any of his IEP goals.  Without knowing what level H.R. was at when the goal was developed nor what level he when the December 2018 IEP Progress Report was completed, the report that H.R. made "some" progress is misleading and the probability that he made any progress on these two math goals is suspect.

42.   On January 11, 2019, H.R. refused to work on his spelling test and he proceeded to sit on the floor by his desk.  FOF 51.  When his teacher ignored him, his behavior escalated and he started kicking the desk, hitting the wall, throwing things around the classroom.  *Id*.  The teacher evacuated the classroom and alerted the crisis team.  *Id*.  H.R. was restrained.  When he was released from the restraint, he punched his teacher in the genitals and kicked her several times. *Id*.  He also scratched another teacher and punched her.  *Id*.  He attempted to attach her with a pencil.  *Id*.  KISD charged H.R. was assault with bodily injury-employee.  *Id*.

43.   A Campus-Level Conference was held on January 18, 2019 to determine whether H.R.'s behavior met the Student Code of Conduct criteria for placement at the Disciplinary Alternative Education Program ("DAEP"). FOF 52.    The principal determined H.R.'s behavior met the criteria for placement at the DAEP.  *Id*.  His parents disagreed.  *Id*.

---

[6] While one of the functional-physical factors goals claimed he made "some" progress, it also reported he had not complied with staff when trying to help him calm down

44.     Following the conference, the ARDC met to conduct a manifestation determination review ("MDR").  FOF 53.  The committee determined that H.R.'s conduct was not a direct result of the KISD's failure to implement his IEP, the conduct in question was neither caused by, nor had a substantial relationship to H.R.'s disabilities, and his behavior was not a manifestation of his disabilities.  FOF 54.

45.     However, the ARDC did not reach consensus.  FOF 55.  H.R.'s parents disagreed with the findings as did two KISD LSSPs attending the MDR.  *Id.*  The majority opinion was that H.R.'s behavior was not a manifestation of his disabilities because it appeared to be attention-seeking, deliberate, targeted and done in such a way as to minimize adult attempts to intervene. *Id*.  His parents and the two LSSPs relied on the recent evaluation and believed that his behavior was a manifestation of his disabilities.  FOF 56.  The testifying LSSP stated that H.R.'s lack of communication skills and social skills may have contributed to the behavior in question.[7] *Id*. The LSSP did not recant or negate his position. *Id*.

46.     The HO found the evidence supported a finding that the ARDC incorrectly determined that H.R.'s conduct on January 11, 2019 was not caused by or had no direct and substantial relationship to his disabilities.  FOF 57.

47.     In addition to various findings that the evidence did not support findings on several issues asserted, the HO found the evidence did not prove that H.R.'s IEPs and BIPs were not reasonably calculated to provide him a meaningful benefit nor that he was entitled to tuition reimbursement for the unilateral placement at Oak Creek Academy.  FOF 59.  It is this finding that is the basis for this appeal.

---

[7] The other LSSP was no longer employed by KISD.

15

48.     Additional findings that are in err include that KISD conducted proper evaluations and that KISD staff were trained on working with H.R. in implementing his IEPs and BIPs.  These errs in fact will also be included in this appeal.

## DISCUSSION

### Standard of Review

When a district court conducts a review of a special education hearing officer's decision, the district court "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  Although the district court is directed to give the hearing officer's findings "due weight," the statute does not state that the district court must defer to those findings when its own review of the evidence indicates that the hearing officer erroneously assessed the facts or erroneously applied the law to the facts.  *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051.  In *Teague Independent School District v. Todd L.*, the Fifth Circuit explicitly adopted the view that the district court's review of the hearing officer's decision is virtually *de novo*.  The court held that "[a]lthough the district court is directed by the statute to give the hearing officer's findings 'due weight,' … the statute does not state that the district court must defer to those findings when its own review of the evidence indicates that the hearing officer erroneously assessed the facts or erroneously applied the law to the facts."  *Teague Independent School District v. Todd*, 999 F.2d 127, 131 (5th Cir. 1993); see *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist*., 328 F.3d 804, 808 (5th Cir. 2003); *see also A.A. v. Northside Indep. Sch. Dist*., 2020 U.S. App. LEXIS 7229 (5th Cir. 2020).  The district court is to perform a virtually de novo review of the hearing officer's decision and make "independent decisions based on a preponderance of the evidence."  *Id.* citing to *Rowley*, 458 U.S. at 204, 102 S.Ct at 3050 (quoting S.Cong.Rec. 37416

(1975)(remarks of Sen. Williams).   Thus, finding the district court did not err when it subjected the hearing officer's decision to a searching review, the Fifth Court held that the district court's legal conclusions are reviewed de novo, while "findings of 'underlying fact' are reviewed for clear error." *Teague,* 999 F.2d at 131. Decisions such as if a student obtained an educational benefit from a school's special education services are underlying findings of fact. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Barry F*., 118 F.3d 245, 252 (5th Cir. 2017). Under clear error review, a factual finding may be reconsidered when, after reviewing all of the evidence, the appellate court is left with the definite and firm conviction that a mistake has been committed." *Renee J. ex rel. C.J. v. Houston Indep. Sch. Dist.,* 913 F.3d 523, 528 (5th Cir. 2019).

At the same time, "deference is based on the application of expertise and the exercise of judgment by school authorities." *Endrew F. v. Douglas Cnty. Sch. Dist., RE-1.* 137 S.Ct. 988, 1001 (2017).   "By the time any dispute reaches court, school authorities should have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement." School officials are expected to offer a "cogent and responsive explanation" for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Id*. at 1002.

## ARGUMENTS AND AUTHORITIES

Plaintiff asserts that KISD denied him a FAPE during the 2018-19 and the 2019-20 school year as follows.

H.R. is a child identified under the IDEA as needing special education and related services as a child with Autism.  Autism is a neurodevelopmental disorder significantly affecting verbal and nonverbal communication and social interaction, generally marked by impaired social and communicative skills, and "engagement in repetitive activities and stereotyped movements, resistance to environment change or change in daily routines, and unusual responses to sensory

experiences" that adversely affects a child's education performance.   34 CFR §300.8(c)(1)(i) (2015).   H.R. has an average IQ (standard score of 95) and initially, many of his academics were in the average or below average range.   JEX 5.059; JEX 5.062-063. He was capable of doing grade level work.   HOD p. 21.

**Issue:  Whether the Hearing Officer erred in finding that KISD offered H.R. FAPE.**

***H.R.'s IEP was not reasonably calculated to enable him to make progress appropriate in light of his unique circumstances.***

The IDEA offers states federal funds to assist in the education of children with disabilities.   20 U.S.C.  §1400 et seq.  In exchange, the state agrees to comply with statutory conditions.   Among these conditions, the state must make available to all eligible students with disabilities between the ages of 3 and 21, inclusive, a free appropriate public education (FAPE). 20 U.S.C. §1412(a)(1)(A).   A FAPE, as defined by the IDEA, includes both "special education" and "related services" that are provided at public expense, under public supervision and direction, and without charge, include an appropriate preschool, elementary school, or secondary school education, meet the standards of the State educational agency and are provided in conformity with the individualized education program.  20 U.S.C. §1401(9).

"Special education" is defined as specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability that includes but is not limited to instruction in the classroom and instruction in physical education.   20 U.S.C. §1401(29).   The term "specially designed instruction" means "adapting, as appropriate to the needs of an eligible child …, the content, methodology, or delivery of instruction – (i) To address the unique needs of the child that result from the child's disability; and (ii) To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children."  34 C.F.R. §300.39(b)(3).

The centerpiece of the IDEA is the child's individualized education program ("IEP"). *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed. 2d 686 (1988).  An IEP is a comprehensive educational plan developed, reviewed and revised by the child's IEP team which includes the child's teachers, parents, and school officials.  20 U.S.C. §1414(d).  An IEP includes the following:

(I)     A statement of the child's present levels of academic achievement and functional performance, including (aa) how the child's disability affects the child's involvement and progress in the general education curriculum…;

(II)    A statement of measurable annual goal, including academic and functional goals, designed to – (aa) how the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and (bb) meet each of the child's other educational needs that result from the child's disability;

(III)   A description of how the child's progress toward meeting the annual goals described in subclause (ii) will be measured and when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided;

(IV)    A statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports of school personnel that will be provided for the child (aa) to advance appropriately toward attaining the annual goals;
(bb) to be involved in and make progress in the general education curriculum in accordance with subclause (1) and to participate in extracurricular and other nonacademic activities; and
(cc) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this subparagraph;

(V)     An explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and …

(VI)    (aa) a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child on State and districtwide assessments …; and
(bb) if the IEP Team determines that the child shall take an alternate assessment on a particular State or districtwide assessment of student achievement, a statement of why –
(AA) the child cannot participate in the regular assessment; and
(BB) the particular alternate assessment selected is appropriate for the child;

19

(VII)   The projected date for the beginning of the services and modifications described in subclause (IV), and the anticipated frequency, location, and duration of those services and modifications; and…
20 U.S.C. §1414(d).

To meet its substantive obligation under the IDEA, a school must offer an IEP "reasonably calculated to enable a child to achieve passing marks and advance from grade to grade." *Rowley*, at 204, 102 S.Ct. 3034, 73 L.Ed. 2d 690. However, at that time, the Supreme Court declined "to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act." *Id*. In *Endrew F. v. Douglas Cnty., Sch. Dist. RE-1*, the Court explained further that "[t]o meets its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017). Because the essential function of an IEP is to set out a plan for pursuing academic and functional advancement, the IEP must aim to enable the child to make progress. *Id*. Focusing on the particular child, the instruction must be "specially designed" to meet the child's "unique needs" through an "[i]ndividualized education program." 20 U.S.C. §§1401(29), (14). Because it is not a form document, it is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth. 20 U.S.C. §§1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv).

In *Rowley*, the Court had no need to provide concrete guidance with respect to a child who was not fully integrated in the regular classroom and not able to achieve on grade level. *Endrew F.*, 137 S.Ct. at 1000. Amy R. was progressing smoothly through the regular curriculum. However, if that is not a reasonable prospect for a child, the IEP need not aim for grade-level advancement but "[h]is educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for

20

most children in the regular classroom." *Id* at 1000.  While the goals may differ, the child should

have the chance to meet challenging objectives.  *Id*.  The Court stated

> "[w]hen all is said and done, a student offered an educational program providing 'merely more than de minimis' progress from year to year can hardly be said to have been offered an education at all.  For children with disabilities, receiving instruction that aims so low would be tantamount to 'sitting idly…awaiting the time when they were old enough to 'drop out.' (citations omitted).  The IDEA demands more.  It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id*. at 1001.

Although the Supreme Court did not attempt to elaborate on what "appropriate" progress looks

like, the adequacy of a given IEP turns on the unique circumstances of the child for whom it was

created.  *Id*.

The Fifth Circuit follows its analysis articulated in *Michael F. ,* and review the IEP to

determined (1) if the program is individualized on the basis of the student's assessment and

performance; (2) the program is administered in the least restrictive environment; (3) the services

are provided in a coordinated and collaborative manner by the key stakeholders; and (4) the

student received positive academic and non-academic benefits.  *Cypress-Fairbanks Indep. Sch.*

*Dist. v. Michael F.*, 118 F.3d 245, 253 (5th Cir. 1997).   Which factor carries the most weight can

vary.  *Richardson Indep. Sch. Dist. v. Michael Z. and Carolyn Z. ex rel. Leah Z.*, 580 F.3d 286,

293 (5th Cir. 2009). According to the Fifth Circuit, these factors are 'indicators' of an IEP's

appropriateness – intended to guide a district court in the fact-intensive inquiry of evaluating

whether an IEP provided an educational benefit but the court is "not required to consider them or

to weigh them in any particular way." *Id.*   While a student's IEP "need not be the best possible

one, nor one that will maximize the child's educational potential; rather it need only be an

education that is specifically designed to meet the child's unique needs, supported by services

that will permit him 'to benefit' from the instruction."  *Michael F.*, 118 F.3d at 247-48.

The Hearing Officer found that the IEPs and BIPs developed in the school year 2018-19 were reasonably calculated to provide H.R. a meaningful educational benefit under the IDEA. HOD p. 23.  Analyzing the four *Michael F.* factors, the Hearing Officer found H.R.'s program was individualized based on assessments and performance.  *Id.*   The Hearing Officer claimed that the record was "replete" with evidence that the ARDC thoroughly reviewed H.R.'s evaluations and gathered additional data to identify his individualized needs.  *Id.*  She claimed he was evaluated multiple times as his behaviors "morphed" or academic performance changed. HOD p. 19.  She found his IEPs included a detailed statement of his PLAAFP in accordance with 34 C.F.R. § 300.320.   According to the Hearing Officer, the ARDC "considered Student's strengths, parental concerns, the result of recent evaluations, and Student's academic, developmental, and functional needs" and the use of positive behavioral interventions to address behavior as well as his language needs as a student with limited English proficiency.  *Id.*  The Hearing Officer also claimed that the ARDC "noted several on-going and increasing concerns Student needed self-regulation goals to help him understand how he can make better choices." *Id.*    In support, the Hearing Officer claimed that H.R.'s IEPs and BIPs clearly were individualized based upon assessments and performance and "[t]he Committee developed IEPs that included (1) a statement of Student's present levels of academic achievement and functional performance; (2) measurable annual goals; (3) a description of how Student's progress toward meeting the annual goals would be measured; (4) a description of personal care services; (5) an AU supplement; (6) a description of limited English proficiency services; (7) a BIP; (8) accommodations; (9) support services; and (10) LRE."  *Id.*   However, the Hearing Officer offered no citation to the record or evidentiary support for these conclusions.

**Issue: Whether the Hearing Officer erred when she found H.R.'s Individual Educational Program was individualized based on Assessments and Performance.**

 *A Review of Assessments/Evaluations Conducted*

A review of the record reveals that since enrolling in KISD five full and individual evaluations ("FIE") have been conducted beginning with when H.R. was in pre-kindergarten during the 2014-15 school year.  JEX 1.001-017.  FIEs were conducted by KISD on September 7, 2015 and November 2, 2015. JEX 2.019-028; JEX 3.029-042.   In addition to the FIEs conducted by KISD, there was an independent educational evaluation conducted on March 12, 2017.   KISD also conducted several Reviews of Existing Evaluation Data ("REED"). J EX 6.091-094; JEX 18.0454-0457. The reasons there were so many evaluations conducted is that KISD denied H.R. met eligibility criteria in special education until his mother brought medical records from a hospitalization stay at Metroplex Behavior Unit during the summer of 2015.  It was not until November of 2018 that the KISD agreed H.R. met eligibility criteria as a child with Autism based on an independent educational evaluation completed in March 2018.   At the ARDC meeting held in May 2018 that considered the independent educational evaluation and discussed the AU eligibility, the school members of the committee refused to accept the AU eligibility.  Since the beginning his mother suspected H.R. was autistic but the KISD refused to accept that eligibility and, instead, found H.R. eligible as a student with an OHI (ADHD).  So, while there are multiple evaluations, the evaluations conducted by KISD were not instrumental in providing appropriate educational services but rather were used to deny H.R. eligibility as a student with autism and the services he needed to address his autistic behaviors.

In addition to FIEs, the KISD also conducted several Functional Behavioral Assessments ("FBA") to develop, review and/or revise H.R.'s Behavior Intervention Plan ("BIP").  PEX 6 (October 2015); PEX 11 (January 2017); JEX 27 (October 2018).

Despite all these assessments and FBAs, KISD failed to individualize H.R.'s IEP based on the assessments conducted and were not able to provide H.R. with an appropriate program while he was enrolled in KISD.

***Present Levels of Academic Achievement and Functional Performance***

As noted above, an individualized education program must include a statement of the child's present levels of academic achievement and functional performance or "PLAAFPs" including how the child's disability affects the child's involvement and progress in the general education curriculum.  34 CFR § 300.320(a)(1).  It is essentially a baseline of academic and functional skills that reflects the entire range of the child's needs, including both academic areas (reading, math, science, etc.) and non-academic areas (behavior, daily life activities, etc.) from which to define the child's educational programming and to measure future progress.  *Id.*; *Bakersfield City Sch. Dist*. 51 IDELR 142 (SEA CA 2008).  While using tests scores is not always appropriate, test scores accompanied with individual analysis is common.  *See O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 702 (10th Cir. 1998) (*See* Appendix C to Part 300 of the Federal Regulations - "[T]here should be a direct relationship between the present levels of educational performance and the other components of the IEP."); *see also Chase v. Mesa County Valley Sch. Dist. No. 51*, 2009 U.S. Dist. LEXIS 84671 (D. Colo. 2009). If test scores are used, they should be self-explanatory or easily understandable so that all participants by all IEP team members without the use of test manuals or other aids.  *Pocatello Sch. Dist*. #25, 18 IDELR 83 (SEA ID 1991) (Parents could not fully understand the proposed IEP or participate in the IEP process because, among other things, numeric test scores were neither explained nor self-explanatory.).

The Department of Education ("ED") refused to include a definition of "academic achievement" in the 2006 IDEA regulations noting that "'academic achievement' generally

refers to a child's performance in academic areas (e.g. reading or language arts, math, science, and history." 71 Fed. Reg. 46,662 (2006).  The ED also refused to define the word "functional" explaining the word is generally used to refer to activities and skills not considered academic or achievement related and is often used in the context of routine activities of everyday living.  *Id*. If the PLAAFP statement does not consider the student's unique needs, establish a baseline for establishing goals and monitoring progress, or allow informed parental participation in the IEP process, the IEP may be found to deny FAPE.  *See, e.g. Friedman v. Vance*, 24 IDELR 654 (D. Md. 1996); and *Portland Pub. Schs.*, 24 IDELR 1196 (SEA ME 1996).  If the goals are inappropriate in light of the student's abilities or are identical to goals from prior IEPs, a court may find that the student was not offered a FAPE or is not making progress.  The IEP must reflect the child's special education needs.  *In re: Student with a Disability*, 59 IDELR 205 (SEA NY 2012) (IEP drafted for student with auditory progress disorder did not accurately reflect the student's special education needs.) In *Dover-Eyota Indep. Sch. Dist. #533*, although the Minnesota ED declined to find that a district's failure to provide progress reports, it remarked that the reports would have shed little light on the student's progress given the lack of baseline data for the four IEP goals in reading, math, social interaction, and physical skills.  *Dover-Eyota Sch. Dist. #533*, 113 LRP 23875 (SEA MN 02/13/13).  Further, the student's PLAAFPs did not specify the student's reading level, math abilities, social interaction skills, or physical skills making it impossible to determine if the student made adequate progress.  *Id*.

Based on a review of the November 14, 2019 Annual ARD held to develop his IEP for the 2018-2019 school year, the PLAAFPs list beginning of the year MAPs[8] assessment scores for reading, math and science.  JEX37-0536.   According to the PLAAFP, H.R. scored a 136 in reading.  *Id.*  The RIT score for reading was 187.  In Science, his score was listed at 163 and the

---

[8] There is no reference in the PLAAFP as to that "MAP" stands for.

RIT score was 187; his score in math was 151 and the RIT score was 188.  *Id.*  Based on his performance on the MAP, his Lexile score was BR.  There was no explanation of what any of these scores meant or how they were relevant to what H.R. knew or was able to do.  *Id.*  Just like the parents in *O'Toole*, H.R.'s parents were not provided with any explanation of these test scores nor were the scores self-explanatory.

The PLAAFP in this ARD document states that as of November 9, 2018, H.R. was currently at 7% since the beginning of school and had low test scores on the first level.  *Id.*  On Success maker, he was working at a 2.5 grade level in reading but refusing to complete lessons.  *Id.*  In math, it was reported he was working at 2.79 grade level but only accomplishing 2 lessons since the beginning of the school year.  *Id.*  This information is meaningless without additional information.  None of these abbreviations are explained – What is MAP?  What is RIT?  What is Success maker?  How do these scores tell anybody, particularly his parents, what H.R. knows and is able to do?  What does it mean to be working at a 2.5 grade level in reading?  What does it mean to be working at a 2.79 grade level in math?  Seven percent of what?  The PLAAFPs fail to include what H.R.'s abilities are or what his needs are.  Without this information, H.R.'s IEP goals failed to provide him a FAPE.

What the PLAAFP does report is that once H.R. got to school, he ate breakfast and slept until he woke up around 9:45 -10:00, with staff trying to wake him up every 30 minutes.  *Id.*  It was reported that the ESL teacher could get him to work when she provided services, but "most of the time he refused to get up."  *Id.*  He refused to complete any assignments involving reading.  *Id.*  Indications are that he did not make adequate progress on his last goals and his absences and ABA therapy sessions significantly impeded his progress.[9] Id.  According to this PLAAFP, his

---

[9] ABA or Applied Behavior Analysis therapy, a therapy for children with Autism, is not provided by KISD.

ADHD, along with the learned avoidance tactics he exhibited when completing reading or writing assignments, interfered with his ability to be successful when reading word problems in math and his grades in science and social studies.  JEX 37:0537.  He often destroyed his work when he became frustrated/upset.  *Id*.  Regarding his behavior, his PLAAFP stated that when he was frustrated, he engaged in self-harming behaviors toward himself and others.  *Id.*  He urinated on himself intentionally.  *Id*.  When upset, it was difficult to redirect him and get him to comply with any directions to use his coping skills.  *Id.*  This information is insufficient to consider this a PLAAFP.  There is no frequency data provided.  What behaviors does he exhibit when he is frustrated/upset?  How often do these behaviors occur?   When do they occur? Without this baseline information, progress cannot be measured.  Without PLAAFPs, the ARD committee could not develop measurable annual goals to measure progress because there the ARD committee had no supporting information upon which base annual goals.   Without PLAAFPs upon which to measure progress, H.R. was denied a FAPE.

***Measurable Annual IEP Goals***

The essential function of an IEP is to set out a plan for pursuing academic and functional advancement.  See 20 U.S.C. §§1414(d)(1)(A)(i)(I)-(IV).  A focus on the particular child is at the core of the IDEA.  *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1,* 137 S.Ct. 988, 999 (2017).  The instruction offered must be "specially designed to meet the child's unique needs" through an "individualized education program."   20 U.S.C. § 1401(29), (14).   The IDEA at 20 U.S.C. §1414(d)(1)(A)(i)(II)  requires that every IEP include a description of a measurable annual goal, including academic and functional goals designed to meet the child's needs as a result of the child's disability to enable the child to be involved in and make progress in the general education curriculum and meet each of the child's other educational needs that result from the child's disability.   The IDEA also requires that every IEP include a description of how the child's

progress toward meeting the annual goals will be measured and when periodic reports on the child's progress toward meeting the annual goals will be provided. 20 U.S.C. § 1414(d)(1)(A)(i)(III).

The standard for determining if a student received a FAPE is whether the IEP was reasonably calculated to enable a child to make progress that is appropriate in light of the child's circumstances. *Endrew F*., 137 S.Ct. at 999. Whether an IEP is reasonably calculated to provide an educational benefit is determined prospectively. *Rowley*, 458 U.S. at 207. When the IEP goals are inappropriate in light of the student's abilities or are identical to goals from prior IEPs, a court may find that this is an indication that the student has not been offered a FAPE or is not making progress. *Damarcus S. v. District of Columbia*, 190 F.Supp.3d 35 (D.D.C. 2016). Without any evidence the student's reading comprehension had increased from a first-grade level to a ninth-grade level the prior school year, the court was persuaded goals based on the state standard for ninth-grade students for a student with a Specific Learning Disability were not individualized and failed to meet the student's unique needs. *Jefferson County Bd. Of Educ. v. Lolita S.*, 581 Fed. Appx. 760, 763 (11th Cir. 2014, unpublished). While repetition of goals may be a factor in determining whether FAPE was denied, the analysis should focus on the appropriateness of the repeating goal. If a student's IEP goals appear substantially similar or are the same from year to year, the student may not be receiving a FAPE. *Damarcus S. v. District of Columbia*, 190 F. Supp. 3d 35, 53 (D.D.C. 2016) (The IEP team was required to revise the IEP as appropriate to address lack of expected progress toward the annual goal when from IEP to IEP, the student's goals remained exactly the same even though the mastery benchmark rose). *See also Endrew F. v. Douglas Cnty. Sch. Dist. RE-1,* 137 S.Ct. 988. (2017). In *Endrew F*., the Supreme Court rejected the "merely more than de minimis" progress standard when the student's IEP goals were minimally modified in his second, third, and fourth grade IEPs. *Endrew F*., 137

28

S.Ct. at 1001.  ("When all is said and done, a student offered an educational program providing 'merely more than *de minimis'* progress from year to year can hardly be said to have been offered an educational at all.").    However, slow progress based on changes in baseline performance may show that the IEP goals were appropriately challenging and the student received a meaningful educational benefit.  *K.D. by Dunn v. Downingtown Area Sch. Dist*., 904 F.3d 248, 256 (3d Cir. 2018).

IEPs containing vague or immeasurable goals deny FAPE.   A generalized set of assistive technology goals meant that the student's IEP were not designed to provide a meaningful educational benefit.  *Bastrop Indep. Sch. Dist*., 116 LRP 13753 (SEA TX 01/05/16).  A review of the Annual Goals indicates IEP goals that are vague and immeasurable.  The Annual Goals developed by the November 14, 2019 ARDC fail to meet the legal requirements in the IDEA.

Each IEP goal should correspond to items of instruction or services and identified needs of the student.   *Sacramento City Unified Sch. Dist. v. R.H*. 68 IDELR 220 (E.D. Cal. 2016). Failing to include goals that address all of the needs identified by the evaluator denies the student FAPE.  *Flagstaff Arts and Leadership Acad*., 113 LRP 27180 (SEA AZ 06/15/13).

H.R.'s August 24, 2018 IEP, effective from August 2, 1018 to November 14, 2018 included two Reading goals, a classroom/school skills goal, a fine motor/visual motor goal, a functional behavior goal and a behavioral/emotional goal.  JEX13:0367-0369.  The first annual Reading goal stated as follows:

> Under the following conditions:  Within the next 36 instructional weeks, [H.R.] during direct teach and guided practice, with the teacher using frequent feedback, clear directions, checking for understanding, and positive reinforcement, in a whole or small-group setting, [H.R.] will decode words and blend phonemes to increase word recognition in 4 out of 6 attempts, reflecting 60 % of trials. Currently, when presented with 10 words in isolation, [H.R] is able to identify 2 of the 10 words, reflecting 20% of trials.  Progress will be determined using the following measurement criteria:  Percent of Trials.  [H.R.]'s baseline score was

20.0 Percent on 8/24/2018.   [H.R.] will achieve 60.0 Percent by 11/14/2018. JEX13:0367.[10]

H.R.'s November 14 2018 IEP, effective until November 13, 2019, included two English Language Arts Reading ("ELAR") goals, two Math goals, and five behavior goals.   The first ELAR goal was as follows:

"Under the following conditions:   Within the next 36 instructional weeks, using upper  second grade, lower third grade tests, [H.R.] [H.R.] (sp.) will be able to respond to questions in writing form and be able to read and comprehend the passage and answer questions at his academic level of understanding with 70% accuracy. This will be measured by classroom assignments and classroom and district.. [sp] Progress will be determined using the following measurement criteria:  Percent Accuracy.  [H.R.]'s baseline score was 50.0 (%) on 11/14/2018. [H.R.] will achieve 70.0 (%) by 11/13/2019."  JEX37:0541.

The two goal objectives were as follows:

"Under the following conditions:  By the end of the 1st semester, after reading a story at his read-ability level, [H.R.] [H.R.] will respond to writing task and answer comprehension questions at his academic level of understanding with 70% accuracy, as measured by classroom assignments and classroom and district assessments..   Progress will be determined using the following measurement criteria:  Percent Accuracy.  [H.R.'s] baseline score was 60% on 11/14/2018. [H.R.] will achieve 70 Percent by 11/13/2019."

"Under the following conditions:  By the end of the 2nd semester, after reading a story at his read-ability level, [H.R.] [H.R.] [H.R.] (sp.) will respond to writing task and answer comprehension questions at his academic level of understanding with 75% accuracy, as measured by classroom assignments and classroom and district assessments.   Progress will be determined using the following measurement  criteria: Percent Accuracy.  [H.R.]'s baseline score was 60 percent on 11/14/2018.  [H.R.] will achieve 75 Percent by 11/13/2019.

Reviewing this one ELAR goal, the first question is what is his academic level of understanding?  How long is the passage H.R. must read and comprehend?  How many questions

---

[10] This exact IEP goal was included in the May 31, 2017 ARD meeting and was effective for the 2017-2018 school year until May 16, 2018.   A comparison of the goals indicates that H.R. made no progress during that time.  On August 24, 2018, H.R.'s baseline score on this goal was 20.0 Percent which was the same baseline score he received a year earlier on May 17, 2017.  H.R. made no progress on this goal during the 2017-18 school year.

must he respond to?  Does he have to answer the questions correctly or does any answer suffice?

Why use classroom assignments and classroom and district assessments as methods of evaluation

when H.R. refused to complete any classwork or, if he does, he rips it up?  How was his baseline

score obtained and what is it based on?  Why is the goal's baseline score at 50% yet the baseline

scores of the two objectives are at 60 percent, even though the goal and objectives are essentially

identical?   If H.R. masters the first objective by the end of the first semester, he has mastered the

goal, yet the mastery level of the second objective is higher than the mastery level of the goal

itself.  The only difference between the two objectives is the mastery level - 70% in the first

objective and 75% in the second.

Unfortunately, the remaining goals and objectives have similar issues.

In addition to the issues with the academic goals, the behavior goals are just as troubling.

For example, the first behavior goal states as follows:

Under the following conditions:  By the next annual ARD When given a task or
direction to complete a given assignment, [H.R.] [H.R.] will begin the task within
5 minute and remain on task for a minimum of 20 minutes independently with no
more than 2 prompts on 7 out of 10 independent tasks, as measured by staff data..
Progress will be determined using the following measurement criteria:  Daily
Count.  [H.R.]'s baseline score was 5.0 Per day on 11/14/2018.  [H.R.] will
achieve 7.0 Per day by 11/13/2019.[11]  JEX37:0543.

Problems with this behavior goal include no baseline information.  There is no

information in his PLAAFP that addresses this behavior.  How long does it initially take him to

begin a task?  How many prompts are needed initially?  Does the daily count mean that H.R. can

already begin a task within 5 minutes and remain on task for a minimum of 20 minutes

independently 5 times a day?  This is unclear.  It is unclear what kind of task is required.

---

[11] Errors in the original.

**Issue:  Did H.R. Demonstrate Positive Academic and Nonacademic Benefits?**

H.R.'s October 24, 2018 IEP Progress Report indicated that H.R. was not making progress on his IEP goals.  JEX 26.001-002.[12]  His classroom teacher testified that since these IEP goals were developed by the Ira Cross staff, she had nothing to do with these goals and was not responsible for them.  (T1.342: 15-25; 343:4-7.)

H.R.'s December 21, 2018 IEP Progress Report also indicated that H.R. was not making progress on his IEP goals.[13]  JEX 45.0638-0640.  Although several IEP goals had just recently been introduced, indications were that H.R. refused to complete assignments and work with staff.  JEX 45.0638.  He made no progress on his two ELAR goals, made "some" progress on his two math goals, no progress on one of his behavior goals but "some" progress on the second because of the use of a timer, but no progress on the three behavioral goals addressing emotional factors.  JEX 45.0638-0640.

The Hearing Officer found that little progress noted in the Fall of 2018 until H.R. withdrew from the KISD.  HOD p.21.  The only progress noted was in the area of math and with the use of a timer but, again without knowing H.R.'s abilities prior to the progress monitoring it is highly suspect that H.R. made progress.  Without an accurate baseline of where H.R. was prior to progress monitoring on any of his abilities, it is unlikely he made progress.  In addition, even though mastery level was a percent accuracy, the status was not reported as a percentage.  Further the Hearing Officer appeared to blame his attendance for his lack of progress claiming that attendance had not been a previous issue.  *Id*.  However, as his mother testified, once H.R. had problems on the school bus, he quit going to school the prior school year.  The Hearing Officer also failed to note that when he did attend school, he was allowed to sleep half the

---

[12] This IEP progress report was not included in the HOD.
[13] These IEP goals had already been in effect for approximately 5 weeks.

morning away instead of working.  If H.R.'s attendance had been an issue for his lack of progress, his teacher failed to call an ARDC meeting to address his absenteeism and his sleeping in class which, as required.  20 U.S.C. §1414(d)(4)(A)(ii)(I).  His teacher failed to address either of these behaviors or his lack of expected progress toward his annual goals.  This failure to demonstrate academic and non-academic benefits denied H.R. a FAPE.

**Issue:  Tuition Reimbursement for Private School Placement**

H.R. was unilaterally placed at Oak Creek Academy when his parents refused to send him to the KISD DAEP for 30 school days.  Because the MDR finding by the ARD committee that met on January 18, 2019 was not appropriate, the DAEP placement ordered by the Campus Level Conference was also inappropriate.  Because H.R.'s parents feared for his safety, they unilaterally placed him at Oak Creek Academy.

Since the Hearing Officer found that KISD had not failed to provide H.R. a FAPE, she did not conduct the analysis for tuition reimbursement.  In *School Comm. of Burlington v. Department of Ed. of Mass*., 471 U.S. 359, 369-370, 85 L.Ed. 2d 385, 105 S.Ct. 1996 (1985), the Court recognized the right of parents who disagree with a proposed IEP to unilaterally withdraw their child from public school and place the child in private school.  *Burlington* also held that IDEA's grant of equitable authority empowers a court to order school authorities to retroactively reimburse the parents if the court ultimately determines that the private placement, rather than the proposed IEP is proper under the Act.  *Id*.  A parent is entitled to tuition reimbursement for a private school placement if a court determines that (1) the district's placement is inappropriate; and, (2) the parent's private school placement is appropriate.  *Florence County Sch. Dist. 4 v. Carter*, 510 U.S. 7, 15 (1993).  A private placement can be appropriate even if it does not meet state standards.  34 CFR §300.148(c).  A private placement is appropriate when it offers educational instruction that is specially designed to meet the child's unique needs.  *Id*.

33

The IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free. *Carter*, 510 U.S. at 13. The very reason H.R.'s parents' decision to place H.R. at Oak Creek Academy was the placement at the DAEP. H.R.'s parents were faced with the same decision faced the parents in the Burlington case. In cases where cooperation fails, as in this case, "parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement." *Burlington*, 471 U.S. at 370. The Hearing Officer found the MDR that determined that placement at the DAEP was incorrect. HOD Conclusion of Law #5 p. 21. Clearly, if the MDR that sent H.R. to the DAEP is incorrect, the district's placement at the DAEP is inappropriate. Thus, the first step in the *Carter* analysis is met. Because the MDR ARDC's decision to place H.R. at the DAEP denied H.R. a FAPE, unilateral placement by his parents at the private school should be reimbursed.

There is evidence in the record that Oak Creek Academy provides H.R. with educational instruction that is specially designed to meet his educational needs and offers instructional support and supplementary aids to address his behavioral issues that KISD never did. The instructional services provided are appropriate with teachers and classroom aides that are appropriately trained to work with students like H.R. There is evidence that H.R. was making academic progress based on objective data measures, that he was not sleeping at school nor was he restrained to the same extent he had been while attending KISD. He was not a danger to himself, students or staff. He was able to go on field trips with his classmates without his parents having to escort him – something he had never been able to do while attending KISD. With the finding that KISD denied H.R. a FAPE, tuition reimbursement for the private placement at Oak Creek Academy is appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff H.R. and his parents K.R. and J.R. request judgment as follows:

(1)     This Court take jurisdiction of this matter;

(2)     That the Court enter an order reversing the Hearing Officer's findings in the Decision of the Hearing Officer that H.R. was not denied a FAPE, issued on December 19, 2019;

(3)     That the Court take such additional evidence as it determines as necessary and proper to address the additional issues limited by the Hearing Officer's decision;

(4)     That the Court enter an order finding the Hearing Officer failed to follow Fifth Circuit precedent and a finding that H.R. was denied a FAPE;

(5)     That the Court find that Defendant reimburse H.R. the cost of the private school tuition for the 2018-19 school year and the 2019-20 school year;

(6)     That the Hearing Officer made significant errors of fact that were critical to the substantive issues in this case and thus denied H.R. a FAPE;

(7)     That the Hearing Officer made significant errors of law that were critical to the procedural issues in this case and thus denied Plaintiff H.R. a FAPE;

(8)     That the Court enter an order that Plaintiff was denied a FAPE and an award of compensatory services is an appropriate form of relief for such a denial;

(9)     That the Court grant Plaintiff prevailing party status and grant an award of reasonable attorneys' fees and costs for this action and the administrative proceedings against Defendant in an amount determined at the discretion of this Court as authorized by 20 U.S.C. §1415(i)(3)(B); and,

(10)    That the Court grant Plaintiff H.R. such other, further, and additional relief as the Court may deem just, proper and appropriate.

Respectfully submitted,

*/s/ Yvonnilda G. Muñiz*
**YVONNILDA G. MUÑIZ**
TEXAS BAR NO. 24007717

**LAW OFFICE OF YVONNILDA MUÑIZ, P.C.**
P.O. BOX 92018
Austin, Texas  78709
(512) 288-4279 (Tel.)
(888) 398-8808 (Fax)
ygmuniz@outlook.com [Email]

**OLIVIA RUIZ**

**LAW OFFICE OF OLIVIA RUIZ, P.C.**
P.O. BOX 50142
Austin, Texas 78763
(512) 233-2622 (Tel.)
(512) 233-2622 (Fax)
obruiz@austin.rr.com [Email]


ATTORNEYS FOR PLAINTIFFS